UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-62323-CIV-COHN/SELTZER

ANTHONY BRYSON SR.,

    Plaintiff,

v.

OTTO BERGES; BERGES LAW
GROUP, P.A.; CONSUMER
PROTECTION COUNSEL, P.A.; DEBT
BE GONE LLC; GREGORY FISHMAN;
and SHIELDED NETWORK, LLC,
f/k/a Shielded Legal Network, LLC,

    Defendants.
_____/

## ORDER DENYING DISPOSITIVE MOTIONS

**THIS CAUSE** is before the Court upon Defendants' Motion to Dismiss Amended Complaint [DE 63], Plaintiff's Motion for Partial Summary Judgment [DE 81], and Defendants' Dispositive Motion for Summary Judgment [DE 119] (together, "Motions"). The Court has carefully reviewed the Motions and all related filings and is otherwise fully advised in the premises.

**I.**    **Background**

Defendant Otto Berges, an attorney licensed to practice law in Florida, owns Defendants Berges Law Group, P.A. ("Berges Law") and Consumer Protection Counsel, P.A. ("CPC"). See DE 54 at 3, ¶ 11; DE 64 at 2, ¶ 11; DE 83-1 at 7. At his deposition in this case, Berges testified that clients retain Berges Law and CPC to "investigate the possibility of there being problems within their account with a particular lender or creditor." DE 104-3 at 6. Thus, Berges explained, Berges Law and CPC "verify and validate" the legality and amounts of clients' debts. Id.

Berges Law and CPC operate out of the same building in Fort Lauderdale, Florida.  See DE 83-1 at 3.  The two companies' employees work interchangeably on behalf of both firms' clients.  See id.  And the same individual is the director of operations for both companies.  See DE 104-3 at 11; DE 121-2 at 4.

Defendant Gregory Fishman owns fifty percent of Defendant Debt Be Gone LLC ("Debt Be Gone"), based in Delray Beach, Florida.  See DE 83-3 at 2.  According to Fishman, Debt Be Gone is a "debt validation company" that helps "clients having trouble with their debts."  Id.  Fishman testified that "[w]e try to find out if they've been wronged by a creditor, and we try to validate their current debts."  Id.  But when asked what steps Debt Be Gone takes to validate a debt, Fishman responded that the company "doesn't take any steps at all," that it is "a referral service," and that it refers clients to CPC and Berges Law.  See id. at 2, 5-6; see also DE 54-5.  Fishman further testified that when speaking with prospective clients, he reviews and discusses their credit ratings and reports (with their consent).  See DE 83-3 at 16. In these discussions, Fishman points out possible errors that are subject to the Fair Credit Reporting Act.  See id.  Fishman testified, though, that he also explains to clients, "We're looking to get rid of your debt, we're not here to repair your credit."  DE 120-4 at 11.

Under a fee-splitting agreement, CPC pays Debt Be Gone forty percent of the fees that CPC receives from clients referred by Debt Be Gone.  See DE 54-4; DE 54-5; DE 83-3 at 9; DE 104-3 at 19.  Debt Be Gone is not a law firm, nor is it owned by a licensed attorney.  See DE 83-3 at 2.

Plaintiff Anthony Bryson Sr. resides in Idaho.  In or around April 2014, Bryson was looking for a way to consolidate his debts and improve his credit score.  See DE 70-1 at 9; DE 125-1 at 122.  Bryson submitted general information about his debt

2

through an online contact form.  See DE 83-3 at 13.  As a result, Debt Be Gone sent marketing e-mails to Bryson; he responded to some of the messages and eventually called the company.  See id. at 12; DE 120-4 at 9.  Bryson was directed to a website that contained a proposed services agreement with Debt Be Gone, and Bryson electronically signed the agreement.  See DE 54-1; DE 104-2 at 7-8.  Thereafter, on April 10, 2014, Bryson electronically signed another agreement (the "Contract") between him and CPC.  See DE 54-2 at 5.  The Contract stated that CPC would provide the following services:  disputing the accuracy of Bryson's credit-account balances, obtaining information about the accounts, requesting verification of the debts from debt-collection agencies, asking credit-reporting agencies to reinvestigate any inaccurate or derogatory information on Bryson's credit reports, filing complaints with regulatory agencies, and litigating and settling claims.  See id. at 1-2.

Based on the way Debt Be Gone and CPC presented themselves, Bryson thought they were the same company.  See DE 104-2 at 11; DE 125-1 at 10.  And he expected them to do "whatever everybody said they were going to do"—"fix my bills," "stop the collections," and "work on [my] behalf to fix my credit."  DE 104-2 at 11.  More, Bryson claims that Fishman and a CPC employee promised him that his credit score would "move from poor to good" and that disputed accounts would be removed from his credit reports.  DE 121-1 at 4-5; see DE 121-2 at 4.

The Contract required Bryson to pay an initial fee of $199.00 that was "deemed earned upon receipt."  DE 54-2 at 3.  Also, the Contract provided that Bryson would pay a non-refundable fee of $1,982.00, through twelve monthly installments of $165.00.[1]

---

[1]  The parties agree that twelve monthly payments of $165.00 equal $1,980.00, not $1,982.00 as stated in the Contract.

3

See id.  Each installment included an account-maintenance fee of $50.00.  See id.

Berges and CPC sent form letters to Bryson's creditors disputing the amounts of his debts.  See, e.g., DE 54-6.  The letters indicated that Bryson was considering filing for bankruptcy.  See id.  Bryson maintains, however, that he never planned to file for bankruptcy.  See DE 83-12 at 2; see also DE 73-2 at 9 (Berges's deposition testimony that "[t]he template regarding Bankruptcy Act is for every single letter that we send out, whether the client conscientiously discussed their interest in bankruptcy or not").  When a creditor responded to one of the dispute letters, see, e.g., DE 54-8–54-9, Berges and CPC sent a second form letter that again referenced the "Bankruptcy Act," directed the creditor to provide the information requested in the first letter, and purported to "rescind[]" the account and demand "the return of any consideration" paid to the creditor.  DE 54-10.

Copies of the initial dispute letters were sent to the three major credit-reporting agencies—Experian, Equifax, and TransUnion.  See DE 83-1 at 4; DE 82-2; DE 104-6 at 6.  At least one of the letters Equifax received was sent in an envelope bearing Berges Law's name and return address.  See DE 82-1; see also DE 83-1 at 20-21 (Berges's deposition testimony concerning TransUnion response letter sent to Berges Law's address).  In response to the letters it received, Equifax sent dispute-verification forms to the creditors.  See DE 82-3.  The disputes were reinvestigated, and the results were sent to Berges and CPC.  See DE 82 at 2, ¶ 6.

Bryson became dissatisfied because he felt that the services being provided were not what Defendants had promised.  See DE 125-1 at 22.  In Bryson's view, Defendants had engaged in "illegal conduct" by charging him for services that he did not believe he was receiving.  Id.  Although the record is not explicit on this point, it

4

appears that Bryson terminated his relationship with Defendants after making four monthly payments of $165.00.

Other evidence is also material to the issues presented in the Motions. In a "Client Handbook" published by CPC and sent to all of its clients, the "Welcome" page states that "an attorney can file a lawsuit against a . . . credit reporting agency that violates your rights." DE 83-2 at 15, 17; see DE 83-1 at 14. Berges testified, however, that this statement is incorrect and that CPC does not represent clients in lawsuits against credit-reporting agencies. See DE 83-1 at 14. Too, the handbook describes the Fair Credit Reporting Act and explains that "your attorney" may advise a credit-reporting agency of inaccurate information and, if needed, "file a claim against the . . . credit reporting agency." DE 83-2 at 24. Berges testified that this section was meant to provide information to clients about relief that could be pursued by other consumer-advocacy lawyers, but not by CPC. See DE 83-1 at 16-17. Another part of the handbook, which addresses clients' credit scores, provides that attorneys will require clients to obtain copies of their credit reports, and will then dispute any negative information in the reports. See DE 83-2 at 31. Again, Berges denied that CPC ever took these steps, emphasizing that CPC is "a law firm that verifies and validate[s] debt at the request of a client." DE 83-1 at 19.

The record also contains a "CPC Welcome Call Script" for employees' phone conversations with new clients. See DE 83-2 at 33-44. Under two headings titled "For Private Student Loans" and "For Credit Cards," the call script discusses clients' credit scores and includes the following statement: "Any negative marks on your credit report should not be there when we are finished with your case as we make this a term of our dismissal or settlement." Id. at 35. Similarly, CPC's website represents that the

firm "work[s] to enforce existing consumer protection statutes to resolve . . . [c]redit reporting problems."  DE 83-5 at 1.

On October 9, 2014, Bryson filed this action against Defendants.  See DE 1 (Compl.).  In his current Amended Complaint [DE 54], Bryson claims that Defendants violated several provisions of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679–1679j, and Florida's Credit Service Organizations Act ("CSOA"), Fla. Stat. §§ 817.7001– 817.706.  Relying on Florida common law, Bryson also pleads a legal-malpractice claim against Berges.[2]  Bryson seeks to recover actual and punitive damages, as well as attorney's fees and costs.[3]

In response to the Amended Complaint, Defendants moved to dismiss all claims alleged by Bryson.  See DE 63.  Defendants later moved for summary judgment based on substantially the same grounds asserted in their Motion to Dismiss.  See DE 119.[4] And Bryson moved for partial summary judgment on his CROA and CSOA claims. See DE 81.  The Motions are fully briefed, and the parties have submitted documentary evidence to support their contentions.

---

[2]  The parties agree, and the Court therefore assumes, that Florida law governs this claim.

[3]  In the Amended Complaint, Bryson requested actual damages based on emotional distress and mental anguish, negative financial consequences from not paying certain bills, and amounts paid under the Contract.  See DE 54 at 14-15, ¶¶ 97-100; id. at 17, ¶ 117.  But in a later Stipulation Regarding Damages [DE 63-1], Bryson disclaimed all actual damages except the amounts he paid to Defendants, totaling $660.00.

[4]  Because it raises substantially the same issues and relies on a more fully developed record, Defendants' later-filed Motion for Summary Judgment supersedes their Motion to Dismiss.  Nonetheless, the Court has considered Defendants' argument that the case should be dismissed since Bryson has not joined his wife—a joint owner of his bank account and a co-debtor on his credit accounts—as an indispensable party. See Fed. R. Civ. P. 19.  The Court, however, finds this argument unpersuasive.

6

## II.     Discussion

### A.     Summary Judgment Standards

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must demonstrate that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

If the movant makes this initial showing, the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The non-moving party "may not rest upon the mere allegations or denials in its pleadings," but instead must present "specific facts showing that there is a genuine issue for trial."  Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  "A mere 'scintilla' of

evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker, 911 F.2d at 1577.  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

A court's function at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  In so doing, the court must view the facts in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor.  See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).  The court also must discern what issues are material:  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248.

    **B.**    **Analysis of Parties' Motions**

        **1.**    **CROA and CSOA Claims**

The CROA "regulates the practices of credit repair organizations." CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 669 (2012).  The statute is intended "to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services," and "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b).  "In its principal substantive provisions, the CROA prohibits certain practices, establishes certain requirements for contracts with consumers, and gives consumers a right to cancel."

Greenwood, 132 S. Ct. at 669 (citing 15 U.S.C. §§ 1679b, 1679d, 1679e).  One way these provisions are enforced is through "a private cause of action for violation."  Id. (citing 15 U.S.C. § 1679g).

Under the CROA, a "credit repair organization" is defined as

> any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—
>
> (i)  improving any consumer's credit record, credit history, or credit rating; or
>
> (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)[.]

15 U.S.C. § 1679a(3)(A).  An individual or entity therefore "must meet four requirements in order to fall within the definition of a credit repair organization":

> (1)  Use an instrumentality of interstate commerce or mails;
>
> (2)  To sell, provide, or perform (or represent that it could do so);
>
> (3)  In return for valuable consideration;
>
> (4)  Services or advice about services to improve a consumer's credit record, credit history, or credit rating.

Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 403 (E.D. Pa. 2006) (citing 15 U.S.C. § 1679a(3); Costa v. Mauro Chevrolet, Inc., 390 F. Supp. 2d 720, 727 (N.D. Ill. 2005)).

The CSOA is similar in many respects to the CROA.  Although the substantive provisions of the CSOA differ somewhat from those of the CROA, the CSOA's definition

9

of "credit service organization" is nearly identical to the definition of "credit repair organization" under the CROA.  See Fla. Stat. § 817.7001(2)(a).  Thus, the Court's discussion of whether Defendants meet the CROA's definition applies equally to the CSOA claim.

The arguments in the parties' Motions focus on the fourth element above: whether Defendants, either collectively or individually, provide services or related advice to improve consumers' credit records, histories, or ratings.  Both sides contend that the record shows conclusively that Defendants do, or do not, provide such services or advice.  The Court finds, however, that genuine disputes of material fact exist with respect to this issue.[5]

Viewing the evidence in the light most favorable to Defendants, the record shows that they help consumers reduce their debts by contesting the validity and amounts of those debts with the creditors.  And though some of their marketing materials suggest otherwise, Defendants do not bring actions against credit-reporting agencies or dispute items on clients' credit reports.  Any contacts Defendants have with those agencies, and any steps Defendants take involving clients' credit reports, are merely to help confirm that creditors have actually reduced or eliminated clients' debts.  Nor do Defendants tell clients that their credit histories will be bolstered by Defendants' services.  Also, while Defendants work together in some respects, they are independent from one another and should be treated as such in evaluating whether they are covered by the CROA and CSOA.

---

[5] Because a triable issue of fact exists on this threshold issue, the Court will not decide whether the record establishes any of the claimed statutory violations by one or more Defendants.

In contrast, viewing the facts most favorably to Bryson, Defendants obtain clients in part by promising to dispute negative credit-report information, sue credit-reporting agencies (if necessary), and generally improve clients' credit records.  Defendants make these promises in their marketing documents and during phone calls with prospective clients.  Indeed, Fishman and a CPC employee assured Bryson that his credit score would "move from poor to good" and that disputed accounts would be removed from his credit reports.  Too, the operations and finances of all the Defendants are closely intertwined, and they work in concert—practically as one entity—to obtain and service clients.  See Baker, 440 F. Supp. 2d at 406.

In sum, a jury could reasonably find from the evidence that Defendants are, or are not, "credit repair organizations" and "credit service organizations."  The conflicts raised by the evidence must be resolved by the jury and not by the Court on summary judgment.  See Anderson, 477 U.S. at 249.  Accordingly, neither Bryson nor Defendants are entitled to summary judgment on the CROA and CSOA claims.[6]

### 2. Legal Malpractice Claim

Under Florida law, a plaintiff asserting a claim for legal malpractice must prove "1) the attorney's employment; 2) the attorney's neglect of reasonable duty; and 3) that such negligence resulted in and was the proximate cause of actual loss to the plaintiff." KJB Vill. Prop., LLC v. Craig M. Dorne, P.A., 77 So. 3d 727, 730 (Fla. 3d DCA 2011). Bryson alleges that Berges acted negligently in multiple ways, including by sending vague and misleading form letters to Bryson's creditors.  See DE 54 at 17.  Berges

---

[6] The Court has considered the parties' other arguments regarding these claims —including that certain affidavits filed on Bryson's behalf are defective—but finds that they are unavailing or otherwise do not warrant separate discussion.

argues that any such negligent conduct was not the proximate cause of Bryson's claimed damages.  Viewing the evidence in the light most favorable to Bryson, a jury could reasonably find that the alleged negligence caused Bryson to lose the amounts he paid for Berges's services.  The Court will therefore deny summary judgment to Defendants on this claim as well.

### III.  Conclusion

For the reasons discussed, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss Amended Complaint [DE 63], Plaintiff's Motion for Partial Summary Judgment [DE 81], and Defendants' Dispositive Motion for Summary Judgment [DE 119] are **DENIED.**

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 24th day of August, 2015.

*/s/ James I. Cohn*
JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF